UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                    )
UNITE HERE LOCAL 217,               )
                                    )
        Petitioner-Plaintiff,       )
                                    )
        v.                          )    CA. No. 10-05 S
                                    )
SAGE HOSPITALITY RESOURCES, d/b/a   )
RENAISSANCE PROVIDENCE HOTEL,       )
                                    )
        Respondent-Defendant.       )
_____)

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

On May 4, 2010, this Court entered an Order (the "Order") granting a petition to compel arbitration filed by Petitioner-Plaintiff UNITE HERE Local 217 (the "Union"). Respondent Sage Hospitality Resources, d/b/a Renaissance Providence Hotel (the "Hotel") is appealing that Order, and has refused to go forward with arbitration until its appeal has been decided. Thus, the Union now asks the Court to direct the Hotel to obey the Order and proceed with arbitration. The Hotel responds by seeking a stay of the Order pending its appeal, and in the alternative asking the Court to reconsider it. For the reasons set forth below, the Union's motion must be granted and the Hotel's motion for a stay must be denied. However, the Court will grant in part the Hotel's motion to reconsider the Order, insofar as it

clarifies section II.B.2 of the Order. With respect to the rest of the Order, the Hotel's motion to reconsider is denied.

I.   Background

The dispute over whether the parties must submit to arbitration in this case is fully summarized in the Court's prior Order.  See generally UNITE HERE Local 217 v. Sage Hospitality Res., C.A. 10-05S, --- F. Supp. 2d ----, 2010 WL 1783334, at *1-4 (D.R.I. May 4, 2010).  The Court's discussion here assumes familiarity with that background information.

As a brief synopsis, the underlying conflict concerns the Union's pursuit of a so-called "card check" to determine whether the Union has majority support among Hotel staff.  A contract between the parties, known as a neutrality agreement, gave the Union the right to initiate the card check procedure, which would be conducted by an arbitrator.  However, the parties dispute whether the contract had expired when the Union made its demand.  The duration of the contract depended on the meaning of the contractual term, "full public opening."  See id.

In the Order, the Court decided that an arbitrator should be the one to interpret that phrase, and thus to decide whether the Union's request was timely or not.  The Court acknowledged the general rule that "whether a labor dispute must be arbitrated 'is a matter to be determined by the court.'"  Id., at *2 (quoting Litton Fin. Printing Div. v. N.L.R.B., 501 U.S.

190, 208, (1991)).  However, it found that an exception to the general rule dictated by the First Circuit controlled the outcome in this case.  Specifically, as the First Circuit spelled out in I.B.E.W., Local 1228, AFL-CIO v. Freedom WLNE-TV, Inc., 760 F.2d 8 (1st Cir. 1985) and New England Cleaning Servs., Inc. v. Servs. Employees Int'l Union, Local 254, AFL-CIO, 199 F.3d 537 (1st Cir. 1999), contract termination disputes go to the arbitrator if the agreement contains a broad arbitration clause.

II.  Should the Order be stayed?

Whether the Hotel must be directed immediately to comply with the Order depends on whether it should be stayed until there is a decision on the Hotel's appeal.  Therefore, the Court begins by considering whether the Hotel has demonstrated the right to a stay.

A.  Legal standard for staying a decision pending appeal

The Order granted injunctive relief to the Union by instructing the Hotel to go forward with arbitration.  In deciding whether to stay an injunction pending appeal, the Court considers:

> (1) whether the applicant has made a strong showing of success on the merits; (2) whether the applicant will be irreparably harmed absent [a stay]; (3) whether issuance of the stay will injure other parties; and (4) where the public interest lies.

*Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 n.3 (1st Cir. 2002); *accord* *Martinez Rodriguez v. Jimenez*, 537 F.2d 1, 2 (1st Cir. 1976); *S.E.C. v. Howard*, 646 F. Supp. 2d 161, 162 (D. Mass. 2009). The first factor is the most important one: "The *sine qua non* [of the standard] is whether the [movants] are likely to succeed on the merits" of an appeal. *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993).

B.   Hotel's likelihood of success on appeal

The Hotel fails to demonstrate a "strong showing of success on the merits." *Acevedo-Garcia*, 296 F.3d at 16 n.3. Since the likelihood of success is the *sine qua non* of what must be proved, the shortfall on this factor is fatal to the Hotel's motion for a stay.

The Hotel pins its hopes on a case that neither party cited in the original briefs, *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002). According to the Hotel, *Howsam* implicitly overruled the authority driving the Court's reasoning in the Order. It did so, the Hotel believes, by expanding the general rule that arbitrability poses a question for the court, not an arbitrator:

> [A] gateway dispute about whether the parties are bound by a given arbitration clause raises a "question of arbitrability" for a court to decide. Similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court.

4

Howsam, 537 U.S. at 84 (internal citations omitted).  The effect of those statements, the Hotel reckons, was to sweep aside the special exception for contract termination disputes enshrined in Freedom WLNE-TV and New England Cleaning Servs.

The First Circuit has never confronted the issue of what impact Howsam might have on those cases.  However, the Hotel ignores a distinction at the forefront of Howsam's analysis that deflates its argument.  Howsam, in fact, divided "gateway disputes" into two categories: "substantive" and "procedural." Id. at 84-85.  "Substantive" disputes remain with the Court. This category encompasses two types of issues.  The first type boils down to whether there is a valid contract that binds the parties in question.  For instance, does an agreement containing an arbitration clause bind the successor entity to an employer that merges with another company, or "parties who did not sign the agreement?"  Howsam, 537 U.S. at 84 (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943-46 (1995) and John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546-47, (1964). Alternatively, if there is a "concededly binding contract," a court still must decide a second group of "substantive" arbitrability questions: those that center on the scope of an arbitration clause.  For example, does an arbitration clause cover a "labor-management layoff controversy," or a "claim[] for damages for breach of a no-strike agreement?"  Id. at 84 (citing

AT & T Techs., Inc. v. Comm's Workers, 475 U.S. 643, 651-52 (1986)).

In contrast to "substantive" matters, "procedural" gateway questions go to the arbitrator — even if, as a practical matter, they control whether the underlying disagreement will be arbitrated.  This group includes, for example, questions of "whether the first two steps of a grievance procedure were completed, where these steps are prerequisites to arbitration," id. (quoting John Wiley, 376 U.S. at 546-547), as well as questions of "waiver, delay, or a like defense to arbitrability," id. (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, (1983) (quotation marks omitted)).  The Court in Howsam held that a dispute about the applicability of a limitations period for arbitration contained in a trade organization's rules was "procedural," and thus sent it to arbitration.  See id. at 81 (discussing the rule that "no dispute 'shall be eligible for submission to arbitration . . . where six (6) years have elapsed from the occurrence or event giving rise to the . . . dispute'").

In assessing the Hotel's likelihood of prevailing on appeal, the critical questions are (1) where this dispute falls in terms of the substantive/procedural divide in Howsam, and therefore whether Howsam requires overruling the Order, and, more broadly, (2) whether contract termination disputes that

determine arbitrability can be considered "procedural," thus reconciling First Circuit precedent with Howsam.

As for the first question, it may not be immediately obvious how the controversy over the term "full public opening" should be categorized. However, careful consideration shows that it is more like a "procedural" dispute than a "substantive" one. To begin with, the conflict here does not match either type of "substantive" dispute detailed in Howsam. The parties do not disagree that the Union and the Hotel entered a valid neutrality agreement, which bound both parties when it was in force. Rather, the question is only when the contract came to an end. This, unlike the first type of "substantive" dispute outlined in Howsam, does not call into question whether the relevant parties consented to enter a bargain in the first place. And in contrast to the second type of "substantive" gateway conflict explained in Howsam, here the Hotel and the Union do not clash over the scope of the arbitration clause in the neutrality agreement. There is no question that it covered the Union's demand for a card check, if it was timely made.

Instead, this controversy bears the hallmarks of a "procedural" dispute, judging by the examples given in Howsam. As a practical matter, when the "full public opening" occurred determines the lifespan of the neutrality agreement, and thus the validity of the Union's demand for arbitration. For that

reason, the significance of the "full public opening" provision mimics the issue of the applicability of the limitations period in Howsam, as well as the issue of what contractual grievance procedures required in John Wiley & Sons, see 376 U.S. at 555-56.  All three issues depend on interpreting terms other than an arbitration clause that, nevertheless, happen to set prerequisites to arbitration.  Because this case thus parallels the "procedural" disputes that Howsam says must be arbitrated, Howsam does not compel reversing or reconsidering the Order.

This logic, carried one step further, also answers the second question: if contract termination disputes such as this one can be considered "procedural," then Howsam does not throw Freedom-WLNE TV and New England Cleaning Servs. into doubt. Indeed, at least one First Circuit case decided after Howsam sent a dispute over contract expiration to arbitration where the arbitration clause could be "reasonably construed to embrace disputes over . . . termination." Municipality of San Juan v. Corporacion Para El Fomento Economico De La Ciudad Capital, 415 F.3d 145, 150 (1st Cir. 2005).  This tosses cold water on the Hotel's position that Howsam should cause the First Circuit to reexamine the rule for contract termination disputes that affect arbitrability.

As a final observation, the Court doubts that the recent Supreme Court case Granite Rock v. Int'l Bhd. of Teamsters, 561

U.S. ----, 130 S. Ct. 2847 (2010), which the Hotel cites in a supplemental memorandum, materially improves its chances on appeal.   Granite Rock held that the question of whether a contract had come into being at the time of a potentially arbitrable dispute was for a court.   See id. at 2856 (explaining that the question of "when th[e] agreement was formed" is for a court).   Granite Rock is distinguishable in that it concerned contract formation, as opposed to contract termination. Therefore, the rationale for the Order, as well as for Freedom-WLNE TV and New England Cleaning Servs., was not present: if a termination dispute hinges on the interpretation of a contractual term, then it must be arbitrated if the agreement also contains a broad arbitration clause.

More broadly, although Granite Rock did not mention the substantive-procedural divide in Howsam, the most far-reaching statements of law in Granite Rock can be seen as simply reinforcing the Howsam approach to "substantive" gateway disputes.   In Granite Rock, the Supreme Court announced, "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor . . . its enforceability or applicability to the dispute is in issue."   Id. at 2857-58 (emphasis in original). Contract "formation" and "enforceability" both strike at the issue of whether the parties were bound by an agreement, and

9

thus mirror the first type of substantive dispute discussed in Howsam. As for issues concerning the "applicability" of an agreement "to the dispute" in question, Granite Rock makes clear that such matters "concern the scope of the arbitration clause and its enforceability." Id. at 2856. In other words, they align with the second type of substantive gateway dispute discussed in Howsam.

The Hotel does not argue that Granite Rock rearranged the landscape mapped in Howsam. The Court sees no reason to assume that Granite Rock displaced the prior case, especially when it might reasonably be read to leave the existing regime in place. Therefore, Granite Rock does not help the Hotel make a "strong showing" of success on appeal, since, as discussed, the Hotel has not demonstrated that Howsam calls for a re-evaluation of Freedom-WLNE TV and New England Cleaning Servs.

The inadequacy of the Hotel's submission on the first element of the test for a stay pending appeal is decisive. Although some of the remaining factors come closer to favoring the Hotel's request, they do not generate enough momentum to overcome the lack of authority suggesting that Hotel will win on the merits.

C.   Remaining factors

1.   Irreparable harm

This factor does give the Court pause as to whether a stay might be appropriate.   The Union observes that, by proceeding with arbitration, the Hotel does not waive its objection to the jurisdiction of the arbitrator.   Therefore, a favorable decision from the First Circuit could nullify the arbitrator's conclusions.   See Tejidos de Coamo, Inc. v. Int'l Ladies' Garment Workers' Union, 22 F.3d 8, 14-15 (1st Cir. 1994) (finding that the need to proceed with arbitration pending appeal of objection to jurisdiction did not constitute irreparable harm).   That, however, is beside the point, according to the Hotel.   The reasons, it says, have to do with the approach of the National Labor Relations Board ("NLRB") to card checks.

The Hotel fears that if it learns the Union has attained majority status pursuant to the card check, the genie cannot go back in the bottle.   The NLRB, the Hotel frets, does not let employers avoid bargaining with a union after learning the union has majority support, even if the employer later claims to have some objection to the procedure by which it gained that knowledge.   See Research Mgmt. Corp., 302 NLRB 627, 639 (1991) ("The Union made an offer to prove its majority support through a card check [that the employer accepted].  .  .  .  On being

informed of the Union's majority support, [the employer] was obligated to bargain with the Union."); Sullivan Elec. Co., 199 NLRB 809, 810 (1972) (rejecting an employer's argument that it did not have to recognize the union because it only learned of majority status through an ad-hoc poll conducted by a manager, rather than a formal election). In such cases, an employer cannot protest that it did not understand the ramifications of a card check, or that the card check was technically defective. Accordingly, the Hotel worries that, even if it wins on appeal, and attempts to cease bargaining with the Union for that reason, it might still risk sanctions for unfair labor practices by the NLRB.

In other words, the Hotel despairs that its appeal will be futile if the card check comes out in the Union's favor. If that is true, the consequences of arbitration could be irreversible, and the Hotel would indeed face irreparable harm. The Union does not lay this concern to rest. Rather, the Union answers that the Hotel can obtain judicial review of any unfavorable NLRB award. This comes close to an admission that a victory for the Hotel on appeal would be effectively worthless. What good would a reversal by the First Circuit be if it cannot protect the Hotel from being penalized by the NLRB?

While that type of prejudice could go a long way towards justifying a stay, the Court is not convinced that the Order

will, in fact, land the Hotel in the pickle it describes. What reassures the Court is that this case differs from the NLRB matters cited by the Hotel in at least one material respect. In both Research Management and Sullivan Electric, the employer came to know of a union's majority status through voluntary actions. Specifically, the employer in Research Management accepted a union's offer to prove it had garnered enough support through a card check. See Research Mgmt., 302 NLRB at 638-39. In Sullivan Electric, one of the employer's managers opted to conduct his own informal poll of employees. See Sullivan Elec., 199 NLRB at 810. In situations like those, the employer must bargain with the union, because the employer itself opened the door to acknowledging the union's majority and recognized the Union as the lawful bargaining agent of the employees. As Sullivan Electric explained: "where an employer undertakes a determination which he could have insisted be made by [a formal vote overseen by the NLRB], he may not thereafter repudiate the route that he himself had selected." Id. That is, if the employer makes a miscalculation that most employees oppose the union, and therefore consents to a card check, it "cannot thereafter disclaim the results simply because it finds them distasteful." Id.

    That, however, is not the case here. In contrast to the employers in Research Management and Sullivan Electric, the

13

Hotel is not choosing to discover whether the Union has collected enough members. Instead, it persists in asserting a good-faith objection to the proposed card check by the arbitrator. It will capitulate only because it could otherwise face sanctions by this Court for disobeying the Order. Thus, the logic of Research Management and Sullivan Electric does not apply. The Court sees no reason for the NLRB to punish the Hotel with a rule tailored for employers who attempt a short cut to snuffing out a union, only to have the gambit backfire.[1]

As a result, while the Hotel has articulated a plausible theory of irreparable harm, it has not persuaded the Court that the damage it foresees will actually come to pass. The Hotel therefore does not recover any ground lost due to its weak showing on the merits.

> 2.   Balance of harms

The Hotel also makes no headway in arguing that the balance of harms tilts in favor of a stay. At best, the potential harm

---

[1] The Court believes, based on its past experience, that if the Union wins the card check, the Hotel might nevertheless refuse to bargain with the Union because it disputes the Union's status as the lawful bargaining agent, at least until the First Circuit issues a decision on the appeal. The Union, however, will still obtain a valuable benefit from going forward with the card check immediately: if it obtains a majority it can lock in the obligation to recognize it by the Hotel, and avoid having to wage a campaign for a formal vote at a later time. It could then take up the bargaining process if and when the First Circuit affirmed the Order. If the Court instead stayed the Order, the Union would face the risk of deteriorating employee support, as the Court explains below.

to the Hotel if a stay is denied weighs evenly against the
potential harm to the Union if a stay is granted.

Even assuming the Hotel had detailed a more realistic
threat of prejudice before the NLRB, the Union identifies a
countervailing harm it could suffer if the Order does not take
effect until the appeal is decided.   According to the First
Circuit, delaying the employer's recognition of the union could
choke off union support, and therefore constitute irreparable
harm.   See Asseo v. Centro Medico Del Turabo, Inc., 900 F.2d
445, 454 (1st Cir. 1990) (citing the "very real danger" that
delay would cause employee support to "erode to such an extent
that the Union could no longer represent those employees," and
stating that "[a]t that point, any final remedy which the Board
could impose would be ineffective").   Hence, if anything, the
Union presents an equally compelling case that it will be
injured if the Court rules against it.

> 3.   Public interest

Finally, considering where the public interest lies also
reveals parity between the positions of Hotel and the Union,
even giving the Hotel the benefit of the doubt.

The Hotel cites the principle that the NLRB favors
elections over card checks because they are more reliable.   See
Dana Corp., 351 NLRB 434, 438-39 (2007) (discussing the
superiority of the election process in terms of the secrecy of

employee decisions, the accuracy of information provided to employees, and reliability).   While that is true, the Union contends that South Bay Boston Management demonstrates that the First Circuit takes a different view.   At least tacitly, South Bay Boston Management approved of a neutrality agreement with a clause providing for an arbitrated card check similar to the one at issue here.   See South Bay Boston Mgmt. v. Unite Here, Local 26, 587 F.3d 35, 42 (1st Cir. 2009) ("During [the duration of the neutrality agreement], South Bay enjoyed the benefits of [it], including the ability to invoke the same arbitration clause at issue in this case.").

However, the best counterpunch to the Hotel's policy argument is the following line of reasoning enunciated by the Seventh Circuit:

> Arbitration is supposed to be swift. It will not be
> swift if orders to arbitrate are routinely stayed
> pending appeals from those orders. Then the typical
> arbitration will proceed as follows: the union demands
> arbitration; the employer refuses; the union sues to
> compel arbitration; the employer resists the suit; the
> district court orders arbitration; the employer
> appeals; the order is stayed pending appeal; the court
> of appeals affirms; at last, years after the dispute
> arose, the arbitration can begin. This pattern would
> make a mockery of arbitration as a swift and effective
> remedy in labor disputes.

Graphic Comm's Union, Chicago Paper Handlers' & Electrotypers' Local No. 2 v. Chicago Tribune Co., 779 F.2d 13, 15 (7th Cir. 1985).

Consequently, it is at least as clear that declining to stay the Order will serve the public interest as it is that approving a stay would do so. The Hotel thus fails again to make up for its ineffective attack on the merits. It follows that the Hotel's motion for a stay must be denied, and the Union's motion for a new order directing the Hotel to comply with the Order must be granted.

III. Hotel's motion to reconsider the Order

While the discussion above suffices to explain why the Court declines to reconsider or stay its prior ruling, the Hotel bemoans one unintended consequence of section II.B.2 of the Order that must be addressed. In that section, the Court ventured the opinion that, even if the neutrality agreement had expired at the time of the Union's demand, an arbitrator still might find that the dispute "ha[d] its real source" in the contract, and was therefore arbitrable under the post-expiration arbitrability doctrine. South Bay Boston, 587 F.3d at 43 (quoting United Parcel Serv. v. Union De Tronquistas, 426 F.3d 470, 473 (1st Cir. 2005)). However, the Order clarified that the arbitrator was free to disagree:

> Ultimately, the arbitrator will determine what impact, if any, the post-expiration arbitrability doctrine may have in this case. The arbitrator may conclude that the "full public opening" was either the "opening of hotel doors" or the "grand opening," and from that, he may determine the expiration date of the neutrality agreement. If he concludes that the demand for

recognition came too late, he may nevertheless choose to address the underlying question of majority status.

UNITE HERE Local 217, 2010 WL 1783334, at *7.[2]

Nevertheless, the Hotel complains that the Court waded into an area that was not necessary to decide the matter before it, and in so doing, lethally poisoned any arbitrator against it. Even acknowledging the prophylactic passage quoted above, the Hotel scoffs at the idea that an arbitrator would reject the Court's thinking on the issue. Therefore, the Hotel laments, it is a foregone conclusion that the arbitrator will conduct a card check: even if it prevails on the termination issue, the arbitrator will take the Court's advice and find that the post-expiration arbitrability doctrine calls for arbitration anyway.

The Court does not intend to withdraw any part of the Order, but offers the following two comments to clarify section II.B.2. Hopefully, these will allay some of the Hotel's concerns.

First, in case any doubt remains, let it be clear that the Court fully expects the arbitrator to exercise his or her

---

[2] As an initial matter, the Hotel contends that the Court botched the post-expiration arbitrability analysis, because the doctrine only applies to vested benefits under collective bargaining agreements. That is clearly not true. The First Circuit in South Bay Boston Management applied the rule to a neutrality agreement. See South Bay Boston Mgmt. v. Unite Here, Local 26, 587 F.3d 35, 43 (1st Cir. 2009) (concluding that a dispute had "its real source" in a neutrality agreement with a broad arbitration clause and was thus arbitrable).

independent   judgment   as   to   whether   the   post-expiration
arbitrability rule has any relevance whatsoever to this dispute
and  this  Court  does  not  intend  to  express  a  view  on  that
question, but rather intends only to acknowledge the possibility
of its application.  The parties are entitled to brief and argue
the  issue  before  the  arbitrator,  and  the  Court's  commentary  in
section   II.B.2   has   no   binding   effect   whatsoever.      The
arbitrator,  therefore,  is  free  to  side  with  the  Hotel  and  find
that the post-expiration aribtrability approach is inappropriate
for this case.

Second,  even  if  the  arbitrator  were  to  find  the  doctrine
applicable,  the  Hotel  exaggerates  the  effect  this  might  have.
The Hotel gripes that section II.B.2 signals to the arbitrator
that when the contract ended does not matter, but that is not
so.    If  the  arbitrator  decides  that  the  post-expiration
arbitrability doctrine is relevant, there is only one scenario
in which it could make any difference.  The arbitrator would
have  to  find  that  the  Union  made  its  demand  too  late,  but
nevertheless  obtained  authorization  cards  from  a  majority  of
employees  while  the  neutrality  agreement  was  still  in  effect.
Only then could the underlying issue of majority status have
"its real source" in the contract.  South Bay Boston Mgmt., 587
F.3d at 43.  If the Union blew the deadline both for making its
demand  and  attaining  a  majority  of  cards,  the  substantive

19

dispute between the parties would not have arisen under the agreement, and the post-expiration arbitrability rule would not help the Union.   And if the arbitrator instead accepts the Union's interpretation of "full public opening," there will be no need to reach the question post-expiration arbitrability.

IV.  Conclusion

For the reasons set forth above, the Court DENIES the Hotel's motion for a stay and GRANTS the Union's motion to enforce the Order.   The Hotel is therefore directed to comply with the Order and submit to arbitration.   The Court also DENIES in part the Hotel's motion to reconsider the Order, and GRANTS it in part by making the comments in section III above.

IT IS SO ORDERED.


*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  September 24, 2010